## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael J. Radmer, Jr.,

                Plaintiff,               **MEMORANDUM OPINION**
                                               **AND ORDER**

v.                                          Civil No. 15-3177 ADM/BRT

OS Salesco, Inc.,

                Defendant.

———————————————————————————————————

Phillip Gainsley, Esq., Minneapolis, MN, on behalf of Plaintiff.

Ellen A. Brinkman, Esq., Briggs & Morgan, PA, Minneapolis, MN, on behalf of Defendant.

———————————————————————————————————

## I.  INTRODUCTION

On October 7, 2016, the undersigned United States District Judge heard oral argument on Defendant OS Salesco, Inc.'s ("Omaha Steaks" or the "Company") Motion for Summary Judgment [Docket No. 21].  Plaintiff Michael J. Radmer, Jr.'s ("Radmer") Complaint [Docket No. 1-1] asserts a Minnesota Human Rights Act claim against Omaha Steaks.  Radmer's claim is premised upon alleged sexual harassment and assault on Radmer by his co-worker, direct supervisor, and former girlfriend Hilliary Jordan ("Jordan") while working at the Company's St. Louis Park, Minnesota store.  Compl. ¶¶ 1–15.  For the reasons set forth below, Omaha Steaks' motion is granted.

## II. BACKGROUND[1]

### A. Radmer and Jordan

Radmer and Jordan met while they both were employees at U.S. Bank.  Brinkman Decl. [Docket No. 24] Ex. 1 ("Radmer Dep.") 69:9–10; 75:2–3.  In December 2013, a few months after meeting, they developed a consensual, sexual relationship.  Id. 76:17–77:12.

In July 2014, Jordan left U.S. Bank and was hired as an Assistant Store Manager at an Omaha Steaks' store in St. Louis Park, Minnesota.  Brinkman Decl. Ex. 12.  A few weeks after starting her new job, Jordan and company representatives raised concerns about store manager, Steve Clem ("Clem").  Id. Ex. 4 ("Oehmen Dep.") at 24:11–19.  When confronted with questions about "inventory variances," Clem resigned and Jordan was almost immediately promoted to Clem's position as store manager.  Id. Ex. 2 at 12:10–18; 13:24–14:2.  Jordan was promoted despite concerns about her credit rating, a factor Omaha Steaks considers when promoting individuals into fiduciary roles.  Gainsley Decl. [Docket No. 28] Ex. K at 10; Ex. I at 17:23–18:7.  At this time, Jordan was the only employee who worked at the St. Louis Park store.  Oehmen Dep. 36:16–20.

Radmer and Jordan's romantic relationship continued, and the two agreed to lease an apartment together starting in September 2014.  Radmer Dep. 82:12–19.  Around the time the apartment lease was set to begin, Radmer, dissatisfied with his job at U.S. Bank, stopped reporting to work and his employment with the bank ended.  Id. 69:5–70:19.  On September 8,

---

[1] A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

2014, Radmer moved into the new apartment.  Id. 82:12–13.  However, he moved out six days

later after quarreling with Jordan.  Id. 82:23–84:24.  Radmer states their romantic relationship

ended at this point.  Id. 86:11–20.

On September 15, 2014, one day after their breakup, Radmer sent Jordan a copy of his

resume to apply for an open sales position at Omaha Steaks' St. Louis Park store.  Brinkman

Decl. Ex. 13.  On September 19, 2014, Radmer formally interviewed for the position with

Jordan.  Id. Exs. 14, 15.  Jordan, with the approval of Mark Oehman ("Oehmen"), the store's

district manager, hired Radmer.  Id. Ex. 3 ("Jordan Dep.") 14:8–16.  Jordan did not disclose to

Oehmen her romantic relationship with Radmer, revealing only that they had been co-workers at

U.S. Bank.  Oehmen Dep. 63:9–24.

Radmer's first day of employment at Omaha Steaks was September 30, 2014.  Brinkman

Decl. Ex. 6.  Jordan conducted Radmer's orientation.  Radmer Dep. 110:15–19.  He received

copies of Omaha Steaks' policies and was trained on how to access orientation and training

materials on the Company's intranet.  Id. 109:19–110:9.  Radmer signed a "Statement of

Understanding" certifying that he received a copy of the Employee Information book and that he

was made aware of available human resource materials.  Id. 108:21–25; Brinkman Decl. Ex. 9.

On most days, Radmer and Jordan were the only Omaha Steaks employees working at

the St. Louis Park store.  During the course of Radmer's employment, Oehmen visited the store

three times to perform training, review store performance, and work on the sales floor.  Oehmen

Dep. 70:5–11.  Oehmen also occasionally spoke to Radmer on the telephone.  Id. 70:12–17.  He

estimated the two talked between 15 and 20 times during Radmer's employment.  Id. 121:16–19.

**B.  Omaha Steaks' Policies**

One of the policies Radmer acknowledged receiving and reviewing was Omaha Steaks'
harassment policy  prohibiting sexual harassment in the workplace.  Brinkman Decl. Ex. 8.  This
policy provides guidance on how to report harassment and other inappropriate workplace
relationships, and outlines the Company's prohibition of retaliation against persons who make
good faith reports of such behaviors.  Id.  Employees experiencing harassment of any kind are
directed to report the behavior to a "supervisor, manager, director, vice president or any manager
in Human Resources" as soon as possible.  Id.  While not prohibited, the Company "strongly"
discourages managers and subordinate employees from having personal relationships:

> If an employee dates, solicits for a date, makes sexual overtures toward, accepts
> sexual overtures from, or establishes or attempts to establish a close personal
> relationship with any employee working under their direct or indirect supervision
> or management, both of the involved employees are required to immediately
> disclose this fact in writing to the appropriate Division Head and the Vice
> President of Human Resources.

Id.  Omaha Steaks' Open Door Policy encourages a work environment where employees may
raise problems or concerns about their job.  Id.  The contact information for 20 Human
Resources employees, including the Vice President of Human Resources, is also provided.  Id.

A copy of the Company's policies was stored inside the store and a copy of the
Company's sexual harassment policy was also posted in the employee bathroom.   Jordan Dep.
213:1–9; Oehmen Dep. 120:19–121:4.

**C.  The Harassment**

Radmer alleges Jordan began to sexually harass him immediately after he was hired.  She
demanded Radmer kiss her at the beginning of every shift and she engaged in "continuous
inappropriate flirtation" throughout the day.  Radmer Dep. 17:8–10; 17:22–23.  The harassment

4

was both verbal and physical.  Radmer reports that Jordan performed unwelcomed oral sex on him inside of the store on multiple occasions.  Id. 23:20–21; 30:10–12.  Radmer claims that before the first incident he told Jordan to stop, but he did not say anything the second or third time because he was "resigned" to the situation and his earlier objections "hadn't stopped her." Id. 23:9–15; 29:16–19.  Radmer also states that he and Jordan had sexual intercourse in the back room of the store.  Id. 31:7–24.  According to Radmer, Jordan threatened to fire him if her sexual advances were rebuffed.  Id. 24:4–10.

Jordan's sexual harassment also extended beyond that in the St. Louis Park store. Radmer, who was living with his parents, alleges that Jordan forced him to stay at her apartment as a condition for her to see a doctor for a pregnancy check.  Id. 89:12–21.  Radmer claims that Jordan would not agree to see a doctor unless he stayed in the apartment, prepared her meals, and slept in the same bed with her.  Id. 134:1–13.  According to Radmer, this was the third time Jordan claimed to be pregnant with his child and that he had "no choice" but to acquiesce to Jordan's demands because "[s]he had lied to me about scheduling prior appointments with doctors, and then came up with excuses" for avoiding medical attention.  Id. 133:22–25; 134:8–13.

### 1. The Assault

In the evening of January 24, 2015, Radmer was at his parents' house with a female friend.  Id. 151:25; 152:11–14.  Jordan texted Radmer that she was coming over to drop off a rent check and pick up laundry.  Id. 154:3–6.  Although Radmer responded for Jordan to come by another time, Jordan arrived at the home.  Id. 154:5–9.

Radmer was at the house with another woman.  Id. 152:6–10.  Radmer had been drinking.

5

Id. 152:21–22.  Jordan entered the home by way of a hidden key and the two got into an

altercation.  Id. 154:10–17; 156:4–13.  The police were called.  Id. 158:9–15.  Officers arrived

and interviewed Jordan about what happened.  Jordan told the interviewing officer that she and

Radmer got into an argument about Radmer's drinking.  Gainsley Decl. Ex. B.  Jordan stated that

when she attempted to get Radmer to stop drinking and go to bed, Radmer became physically

violent.  Id.

Radmer was arrested and spent the night in jail.  Radmer Dep. 158:19–25.  The officer

who interviewed Jordan did not see any marks or wounds on her neck.  Gainsley Decl. Ex. B.

An ambulance arrived, but Jordan refused transport and departed the scene in her own vehicle.

Id.  Radmer maintains it was he, and not Jordan, who was assaulted that evening.  Compl. ¶ 5.

Radmer spoke amicably with Jordan at Omaha Steaks' St. Louis Park store shortly after

the altercation.  Radmer Dep. 161:9–18; 164:3–4; 166:8–24.  Radmer claims his reconciliation

efforts were designed to protect his job, although he admits Jordan did not suggest that his job

was in jeopardy because of the incident at Radmer's parents' home.  Id. 164:3–20.  Jordan also

texted Radmer's father after the episode, stating, "I'm not going to do anything at work in

regards to [Radmer's] job."  Brinkman Decl. Ex. 16.  Radmer did not disclose the assault to

anyone at Omaha Steaks other than Jordan.  Radmer Dep. 168:12–19.

### 2.  Other Incidents

Radmer avers that he experienced humiliation in December 2014 after the St. Louis Park

store surpassed its sales quota.  Id. 145:24–146:1; 147:14.  In an email congratulating the store's

accomplishment, Connie Davis ("Davis"), a regional manager, wrote, "[t]hat's another for the

girl's [sic] in [District Three]," to which Jordan replied, "[Radmer] is very sad he is on the girls

team over here :).” Gainsley Decl. Ex. D at 13–14.  Davis responded, “Tell him to put on a dress and buck up!  Girls Rule!  Ok, it is the girls (or should I say Women) Managers that are making the Budgets in [District Three].  No guys yet.  Mike is lucky to be on your Team!”  Id.  In describing the email exchange at his deposition, Radmer stated that he “was appalled that there was someone of Connie Davis’s stature sending an e-mail telling me to ‘put on a dress’ and saying that I’m lucky to be on Hilliary’s team and ‘girls rule.’”  Radmer Dep. 147:15–19.  Radmer states he was “humiliated by it.”  Id. 147:14.

**D.  Radmer Leaves Omaha Steaks**

Prior to his employment at Omaha Steaks, Radmer had been an intermittent student at the University of St. Thomas over a 12 year period.  Id. 51:17–52:2.  On January 27, 2015, Radmer filed a re-enrollment form with the school expressing his intention to return and earn his college degree.  Brinkman Decl. Ex. 17.

On February 3, 2015, Radmer gave Jordan a resignation letter, stating:

> I Mike Radmer am submitting my two weeks’ notice to Hilliary Jordan on today the 3rd of February.  I have appreciated the opportunity to work for such a prestigious and upstanding company.  I have taken great satisfaction in the work I have done here, especially working with Hilliary to reach our budget goal for the year!  I am resigning so I can focus on finishing my English Degree at the University of St. Thomas.

Id. Ex. 18.  Radmer’s last day with the Company was February 17, 2015.  Radmer Dep. 182:21–22.  On the 18th, Radmer emailed Oehmen his resignation letter, and stated:

> I have greatly appreciated the opportunity to work with you at Omaha Steaks.  Your positive attitude and helpful instruction made you a great manager to work for.  If circumstances change, I would welcome the opportunity to return to Omaha Steaks in the future.

Brinkman Decl. Ex. 20.

Radmer confirms he never told anyone at Omaha Steaks, other than Jordan, about the sexual harassment.  He asserts reporting the harassment would have been futile because "I didn't think the company would believe me."  Radmer Dep. 198:16–199:6.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### B.  The Harassment Claim

The Minnesota Human Rights Act ("MHRA") prohibits discrimination based on an employee's sex, and defines "discriminate" to include "sexual harassment."  Minn. Stat. §§ 363A.03; 363A.08.  The statute defines "sexual harassment" as including "unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:

8

. . .

(2) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment. . . or

(3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offense employment [environment].

Minn. Stat. § 363A.03, subd. 43.

For purposes of this motion only, Omaha Steaks does not dispute that Jordan sexually harassed Radmer or that the harassment raises a fact question as to whether Radmer has presented a valid hostile work environment claim. Omaha Steaks does, however, contest the validity of Radmer's MHRA claim, arguing that it is insulated from liability by the Ellerth-Faragher affirmative defense.

In 1998, the Supreme Court considered vicarious liability for supervisors in the context of sexual harassment claims under Title VII of the Civil Rights Act.[2] The Court issued two opinions that together established an affirmative defense for employers against vicarious liability for sexual harassment by supervisors that results in no tangible employment action. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998): Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Therefore, application of the Ellerth-Faragher affirmative defense begins with whether or not there was a tangible adverse employment action.

---

[2] Minnesota relies upon interpretations of Title VII in addressing claims arising under the parallel provisions of the MHRA. Doucette v. Morrison Cty., Minn., 763 F.3d 978, 982 n.5 (8th Cir. 2014); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999).

### 1.  Tangible Employment Action

Omaha Steaks argues that it did not initiate a tangible employment action against Radmer.  According to the Company, Radmer voluntarily resigned his position to return to college and his resignation letter belies any claim that Jordan's harassment was the reason for his departure.  Radmer argues that, despite his explanation in his resignation letter, he was constructively discharged and Jordan's harassment was the real reason for quitting his position with Omaha Steaks.  A constructive discharge qualifies as a tangible employment action that, if substantiated, precludes application of the Ellerth-Faragher affirmative defense.

"Constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination."  Coursolle v. EMC Ins. Grp., Inc., 794 N.W.2d 652, 660 (Minn. Ct. App. 2011) (quotations omitted).  To establish constructive discharge, "a plaintiff must prove that the employer's illegal discrimination created intolerable working conditions and that the employer either intended to force the employee to quit or could have reasonably foreseen that its conduct would force the employee to quit."  Id.  "An employee who quits without giving [his] employer a reasonable chance to work out a problem has not been constructively discharged."  Duncan v. Gen. Motors Corp., 300 F.3d 928, 935 (8th Cir. 2002).

If Radmer's allegations are true, his working conditions were intolerable.  Radmer was harassed daily and as one of only two employees in the store, he was unable to escape Jordan's harassment by affiliating with different employees or working in a different location inside the store.  Radmer's constructive discharge argument falters, however, because the record lacks evidence that Omaha Steaks was given an opportunity to remedy his working conditions.  Radmer testified that he never told anyone at Omaha Steaks about Jordan's harassment.  The

Company avers, and Radmer does not directly contest, it first received notice of Jordan's harassment by way of a May 27, 2015 letter drafted by Radmer's attorney after Radmer had resigned his position.[3]  Since the Company first learned about the harassment after Radmer had already resigned, Omaha Steaks was not given an opportunity to resolve or remedy Radmer's claims.  Consistent with <u>Duncan</u>, Radmer was not constructively discharged.

Since Radmer did not suffer a tangible employment action because of the harassment, Omaha Steaks is entitled to assert the <u>Ellerth-Faragher</u> affirmative defense.  The affirmative defense is applicable if the employer can show that it "(a) exercised 'reasonable care to prevent and correct promptly any sexually harassing behavior'; and (b) the employee 'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'"  <u>Crawford v. BNSF R.R. Co.</u>, 665 F.3d 978, 983 (8th Cir. 2012) (quoting <u>Faragher</u>, 524 U.S. at 807).

### 2.  Omaha Steaks Exercised Reasonable Care to Prevent and Correct any Sexually Harassing Behavior

Omaha Steaks argues that its anti-harassment policy confirms that it took reasonable care to prevent sexual harassment.  Radmer responds that the Company's anti-harassment policy does not insulate it from its failure to properly hire, train, and promote Jordan, and that had the proper procedures been followed, Jordan never would have been in a position to harass Radmer.

The prevention prong of the <u>Ellerth-Faragher</u> defense examines whether the employer

---

[3] For the first time at the motion hearing, Radmer made the argument that the Company actually received notice of harassment from the December 2014 email chain where Radmer was told to "put on a dress" and that "girls rule."  However, the record lacks any evidence showing that Radmer told anyone at Omaha Steaks that he felt harassed by the exchange.  When questioned whether Radmer told Davis or someone else in the Company that the email was inappropriate or harassing, Radmer responded, "no."  Radmer Dep. 148:11–17.

can demonstrate that it took reasonable care both to prevent and correct harassment.  Weger v. City of Ladue, 500 F.3d 710, 719 (8th Cir. 2007).  One way to satisfy this burden is through the distribution of a valid anti-harassment policy.  Although such a policy is "compelling proof that [it] exercised reasonable care in preventing and promptly correcting sexual harassment, it is not dispositive."  Id. (citation and quotation marks omitted).

Evidence cited by the Eighth Circuit as proof that the employer took reasonable care to prevent the harassing behavior is also present here.  In Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1195 (8th Cir. 2006), the Eighth Circuit held that a company's anti-discrimination policies and reporting procedures were sufficient proof to support the Ellerth-Faragher defense to claims of supervisor harassment.  The policy at issue in Gordon was distributed to all employees, including the plaintiff, and identified three company officials with contact information to whom harassment could be reported.  Id.  Omaha Steaks presents even stronger evidence of a reporting procedure than in Gordon.  Radmer admits receiving Omaha Steaks' policies on sexual harassment and that he was trained on how to access the materials on the Company intranet.  The Company's policy, like the one in Gordon, includes the names and contact information of a bevy of human resource employees—20 of them, including the Vice President of Human Resources—that may be contacted to report harassment.

Particularly significant is the complete lack of notice Omaha Steaks received about the alleged harassment.  "[T]he employer's notice of the harassment is of paramount importance" in assessing whether an employer has taken reasonable care to correct the offensive behavior. Weger, 500 F.3d at 720 (citation omitted).  As noted above, Radmer has adduced no evidence showing that Omaha Steaks was aware of Jordan's harassment until after Radmer's departure

which initially appeared to be amicable, even leaving the door open to future employment with

Omaha Steaks.  Without notice of any concerns Radmer may have had about his employment,

the Company cannot be faulted for failing to respond to or for not remedying the harassment.

Finally, Radmer's argument about the hiring, training, and promotion of Jordan is

unpersuasive.  Radmer contends that if Omaha Steaks followed its internal hiring and promotion

procedures correctly, Jordan would not have been in the position to harass Radmer.  But the

inquiry here is directed at whether the employer has exercised reasonable care to prevent any

sexually harassing behavior.  Adams v. O'Reilly Auto., Inc., 538 F.3d 926, 929 (8th Cir. 2008).

Evidence relevant to this question would include a company's anti-harassment and anti-

retaliation policies, and the ease or difficulty employees face in reporting harassing behavior.

The allegation that Omaha Steaks overlooked Jordan's credit score when promoting her to store

manager does not address the Company's reasonableness in preventing sexually harassing

behavior.  Put another way, the connection between Jordan's sexual harassment and her credit

score is too attenuated to be relevant to whether the Company took reasonable care to prevent

sexual harassment in the workplace.

### 3. Radmer Unreasonably Failed to Take Advantage of any Preventative or Corrective Opportunities Provided by Omaha Steaks

The second element of the Ellerth-Faragher defense requires a showing that Radmer

acted unreasonably in failing to avail himself of preventative or corrective opportunities

provided by Omaha Steaks.  The Company argues that Radmer's excuses for not reporting

Jordan's sexual harassment were unreasonable.  Radmer offers multiple reasons for why he did

not report Jordan, ranging from his belief that nobody would believe him to fear of retaliation.

None of Radmer's explanations is sufficient to raise a fact question as to whether it was

reasonable for him fail to avail himself of Omaha Steaks' policies for corrective action.

Although "proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Weger, 500 F.3d at 724 (quoting Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807–08).

The Eighth Circuit has recognized "the enormous difficulties involved in lodging complaints about discrimination in the workplace, including sexual harassment." Weger, 500 F.3d at 724–25 (quoting Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999) (per curiam)).  This is especially true where, as here, the victim perceives a bias in favor of their harasser.[4]  Id. at 725.  However, that burden does not permit a victim of harassment to remain silent, particularly if that victim is trying to hold the corporation vicariously liable for the behavior of an employee.[5]  Workplace sexual harassment is often carried out behind closed doors, outside the view of coworkers and others who would be able to corroborate the allegations.  Consequently, complaints of sexual harassment frequently match one voice against

---

[4] Radmer also argues that reporting Jordan would have been futile because Jordan's father was a long-time employee of Omaha Steaks, who worked as a store manager in San Antonio, Texas.  Jordan Dep. 11:10–25.  This argument is unpersuasive.  There is nothing in the record that suggests Jordan's father's employment in Texas would have influenced the outcome of a harassment complaint made about Jordan's employment in Minnesota.  There is also nothing in the record that suggests Oehmen or any of the other employees Radmer could have reported the harassment to had a preexisting relationship with Jordan's father.

[5] Radmer stresses that his condition of severe social anxiety inhibited his ability to report Jordan's behavior such that his silence is excusable.  While this Court is sympathetic to anxiety conditions and mental illness concerns, Radmer's level of personal subjective conditions cannot transform his silence into a reasonable course of action.

another.  This does not mean, however, that harassment victims seeking to hold their employers

liable for their harasser's behavior are excused from reporting the harassment.  See Matvia v.

Bald Head Island Mgmt., Inc., 259 F.3d 261, 269 (4th Cir. 2001) ("Sexual harassment cases

often involve the word of the harasser versus the word of the harassed employee. . . .  Though we

understand why [an employee] would want tangible evidence to buttress [his] version of the

events, this cannot excuse [his] failure to report").  Radmer's belief that reporting Jordan would

have been futile because the Company would have taken her word over his is not a sufficient

reason for staying silent, as "concerns as to whether the complaint mechanism will fail can be

tested by trying it out if failure is the only cost."[6]  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27,

36 (1st Cir. 2003).

For similar reasons, Radmer's fear of losing his job is also not a reasonable excuse for

failing to take advantage of Omaha Steaks' preventative or corrective opportunities to report

Jordan's harassment.  Radmer admits receiving Omaha Steaks' policy that prohibits retaliation

against individuals who report harassment.  Radmer has no evidence to demonstrate it was

reasonable for him to believe that reporting Jordan would have jeopardized his job.  The record

lacks evidence that Omaha Steaks has ignored or violated its anti-retaliation policy in the past,

leaving Radmer with the fear that he would be subject to retaliation for reporting Jordan's

behavior.  Radmer's subjective fear of retaliation, the Eighth Circuit has repeatedly held, is

---

[6] Radmer attempts to show futility by citing Omaha Steaks' refusal to re-visit this matter after the Company received the letter from Radmer's attorney.  However, when Omaha Steaks received the letter, Radmer had tendered his resignation months ago, had retained counsel, and further Jordan was no longer working for the Company.  Thus, there was no ongoing sexual harassment in the workplace that could be addressed.

insufficient to preclude application of the <u>Ellerth-Faragher</u> affirmative defense.[7]  <u>See</u> <u>Adams</u>, 538 F.3d at 933 (stating that "a fear of retaliation is generally [not] a proper excuse for failing to report sexual harassment").

Radmer's argument that he did not report Jordan because he did not know any high level employees also rings hollow.  Radmer testified that he had face-to-face contact on multiple occasions with Oehmen, a district manager.  Radmer also received a list of 20 Omaha Steaks employees that were explicitly identified as individuals available to receive harassment complaints.  The argument that Radmer's failure to report Jordan was reasonable because he did not know anyone to report to is not supported by the record.

Radmer has not raised a genuine dispute of fact regarding the applicability of the <u>Ellerth-Faragher</u> affirmative defense:  No reasonable jury could conclude Radmer was constructively discharged, that Omaha Steaks failed to exercise reasonable care to prevent and correct any sexually harassing behavior, or that Radmer's failure to take advantage of any preventative or corrective opportunities provided by the Company was reasonable.  Therefore, the <u>Ellerth-Faragher</u> affirmative defense applies and Radmer's claim under the MHRA fails as a matter of law.

**C.  The Assault Claim**

Radmer alleges that Omaha Steaks is liable for the January 24, 2015 incident that

---

[7] Radmer contends that Jordan's promotion to store manager in spite of her poor credit score suggests the protection of Omaha Steaks' anti-harassment policy was less than guaranteed. The Company's bending of its hiring policy is not a relevant comparator to cause one to view the anti-retaliation policy with skepticism.  <u>See</u> <u>Crawford</u>, 665 F.3d at 985 (noting that fear of retaliation was unfounded because the record lacked evidence of prior incidents of retaliation for reporting harassment).  Moreover, Radmer was unaware of the Company's policy pertaining to credit score and the hiring of store managers until this lawsuit was initiated.

occurred at Radmer's parents' house.  Although the alleged assault took place after work hours and not on work property, Radmer contends Omaha Steaks is liable under respondeat superior or a master / servant theory because Jordan's assault was a continuation of her workplace harassment.

Under respondeat superior, an employer is liable for the intentional torts of its employees provided that the acts occur within the scope of their employment.  <u>C.B. ex rel. L.B. v. Evangelical Lutheran Church in Am.</u>, 726 N.W. 2d 127, 133 (Minn. Ct. App. 2007).  "An employer is liable for an assault by his employee when the source of the attack is related to the duties of the employee and the assault occurs within work-related limits of time and place."  <u>Lange v. Nat'l Biscuit Co.</u>, 211 N.W. 2d 783, 786 (Minn. 1973).

There is no genuine dispute that the assault occurred outside of working hours; both Radmer and Jordan testified that the incident took place well after the store was closed.  There is also no genuine dispute regarding the location of the alleged assault; it occurred at Radmer's parents' home.  The record also reflects that Radmer was intoxicated and it was he, and not Jordan, who was arrested and spent the night in jail.  Radmer instead attempts to manufacture a question of fact by arguing that the assault was a continuation of the workplace harassment Jordan was perpetuating.  But that argument ignores the record evidence that irrefutably shows that Jordan's motivation for seeing Radmer that evening was independent of their employment with Omaha Steaks.  Radmer's argument further ignores the reality that Radmer and Jordan had both a professional and personal relationship.  Merely because Radmer and Jordan both worked together and carried on a relationship independent of their employment does not mean that an incident arising in their personal relationship can be attributable to their employer.

17

Radmer maintains that he was the one who was assaulted that evening, arguing that Jordan's account of the incident to the interviewing officer is phoney.  If Radmer's assault claim was made against Jordan, there may be a sufficient factual dispute for a jury to resolve.  But Radmer's claim is not against Jordan, it is against Omaha Steaks.  Thus, the question of whether or not Radmer was assaulted is immaterial unless Radmer can create a fact question as to whether Omaha Steaks can be liable under a respondeat superior or master / servant theory of vicarious liability.  Because there is no genuine question of fact as to whether the assault was related to the employment duties of either Radmer or Jordan, Omaha Steaks cannot be liable for Jordan's actions at Radmer's parents' home.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant OS Salesco, Inc.'s Motion for Summary Judgment [Docket No. 21] is **GRANTED**; and

2.      All claims in the Complaint [Docket No. 1-1] are **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 28, 2016.

18